IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | |
| v. | ) | JUDGE JUDGE GAUGHAN |
| | ) | |
| HAROLD PERSAUD, aka HARRY | ) | Title 18, United States Code, Sections 2, |
| PERSAUD, | ) | 1035, 1347, and 1957 |
| | ) | |
| Defendant. | ) | |

1:14CR276

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

**A.    The Defendant and His Medical Practice**

1.    HAROLD PERSAUD, aka HARRY PERSAUD, was a licensed cardiologist in

the State of Ohio and a resident of Westlake, Ohio.

2.    PERSAUD's private medical practice was known as Harry Persaud, M.D. and

was located at 29099 Health Campus Drive, Suite 110, Westlake, Ohio.  PERSAUD had hospital

privileges at Fairview Hospital, St. John's Medical Center, and Southwest General Hospital ("the hospitals").

**B.      Medicare and Private Insurance**

3.      The Medicare Program was enacted by Congress on July 30, 1965, under Title XVIII of the Social Security Act.  Medicare provided medical insurance benefits to any person age 65 or older, to certain disabled persons and to those with chronic renal disease who elect coverage.  Medicare was a health care benefit program within the meaning of Title 18, United States Code, Sections 24(b) and 1347; it was a public or private plan or contract, affecting commerce, under which medical benefits, items and services were provided to individuals.

4.      Medicare Part A (Hospital Insurance) helped cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care).  Beneficiaries were required to meet certain conditions to receive these benefits.

5.      Medicare Part B (Medical Insurance) helped cover doctors' services, outpatient care, and supplies, when they were ordered by a doctor and medically necessary.

6.      The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services and was responsible for administering the Medicare and Medicaid programs.  CMS had the authority to make coverage and medical necessity determinations.

7.      Anthem Blue Cross and Blue Shield, Medical Mutual of Ohio, United Health Care and Aetna (collectively "the private insurers") were health care benefit programs under Title 18, United States Code, Section 24(b).  Often these private insurers provided secondary or supplementary coverage to individuals who were also covered under Medicare.

2

**C.** **Reasonable and Necessary Services**

8.      Medicare and private insurers prohibited payment for items and services that were not "reasonable and necessary" to diagnose and treat an illness or injury.  Medicare claim forms, for example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient."  The private insurers similarly required providers to certify that services were medically necessary.  In the area of cardiac disease diagnosis and treatment, a doctor, and the hospital where the doctor performs cardiac procedures, could submit claims for reimbursement to Medicare and private insurers, but they were required by law to accurately report the medical condition underlying the claim and only claims that were medically necessary were entitled to reimbursement.

**D.** **Cardiac Disease, Diagnosis and Treatment**

9.      Coronary arterial circulation of blood is fundamental to the functioning of the human heart.  The following acronyms are used to describe the arteries that supply blood to the heart:  LMCA (left main coronary artery); LCX (left circumflex artery); LAD (left anterior descending artery); and RCA (right coronary artery).

10.      Coronary artery disease is the narrowing or blockage of the above described coronary arteries, usually caused by atherosclerosis.  Atherosclerosis (or "hardening" or "clogging" of the arteries) is the buildup of cholesterol and fatty deposits (called plaques) on the inner walls of the arteries.  These plaques can restrict blood flow to the heart muscle by physically clogging the artery or by causing abnormal artery tone and function.  Significant Coronary Artery Disease ("CAD") was defined by the American College of Cardiology Foundation as angiographically as CAD with greater than or equal to 70% diameter stenosis of at

3

least one major epicardial artery segment, or greater than or equal to 50% diameter stenosis of the left main coronary artery.

11.     A nuclear stress test measured blood flow to the heart muscle both at rest and during stress on the heart. It was performed similarly to a routine exercise stress test, but through the use of an injected radionuclide such as thallium, it provided images that showed areas of low blood flow through the heart and areas of damaged or at risk heart muscle. Nuclear Stress Tests were performed by a technician at a doctor's office and were reimbursable by Medicare and private insurers when ordered by a doctor and medically necessary.

12.     An echocardiogram ("ECHO") was a diagnostic ultrasound study of the heart that used Doppler ultrasound to measure the speed of blood flow at a fixed point within the heart. An ECHO was used to assess the function of the cardiac valves, the flow of blood between the heart's chambers and to calculate the ejection fraction, or the amount of blood pumped from each chamber per heartbeat. An ECHO could be performed by a technician at a doctor's office and was reimbursable by Medicare and private insurers when ordered by a doctor and medically necessary.

13.     An electrocardiogram ("ECG" or "EKG") was a diagnostic medical test that measured the electrical activity of the heart. An ECG gave two major kinds of information. First, by measuring time intervals on the ECG, a doctor could determine how long the electrical wave took to pass through the heart. This determined if the electrical activity was normal or slow, fast or irregular. Second, by evaluating the course of electrical activity passing through the heart muscle, a cardiologist could learn if parts of the heart were electrically normal or showed signs of disease. An ECG could be performed by a technician at a doctor's office and was

4

reimbursable by Medicare and private insurers when ordered by a doctor and medically necessary.

14.     Cardiac catheterization was an invasive imaging procedure used by a doctor to evaluate, among other things, the presence of coronary artery disease, and to determine the need for further treatment.   During a cardiac catheterization, a long, narrow tube called a catheter was inserted into a blood vessel in the arm or leg.  The catheter was guided through the blood vessel to the coronary arteries with the aid of an x-ray machine.  Contrast material was injected through the catheter and x-ray movies were created as the contrast material moved through the heart's chambers, valves and major vessels.  The part of the procedure in which x-ray movies were made of a coronary artery was called a coronary angiogram.

15.     An additional imaging procedure, called intra-vascular ultrasound ("IVUS"), could be performed together with cardiac catheterization to obtain detailed images of the walls of the blood vessels.  IVUS used sound waves to enable the physician to see inside the coronary arteries.  During an IVUS procedure, an ultrasound wand was attached to the top of a catheter. This ultrasound catheter was inserted into an artery in a patient's groin area and moved up to the heart.  A computer measured how the sound waves reflected off the blood vessels and changed the sound waves into pictures.  IVUS's primary role was in determining the size (diameter/length) of the diseased artery segment, composition of the disease, and to check the adequacy of stent results.  IVUS was capable of making two measurements in relation to determining whether to insert a stent in an artery.  It could measure and calculate the area percent stenosis and diameter percent stenosis.  To correctly derive an area percent stenosis, one needed to have a reference area from an angiographically appearing normal segment either immediately

5

above or below the diseased segment (or both) that formed the denominator of the percentage

calculation; an isolated cross-section of a coronary artery was not used as it could not assess

whether it was a diffusely diseased artery (which was not amenable to intervention) or whether it

was a focally diseased artery that could be amenable to intervention. PERSAUD sometimes used

IVUS.

     16.    Fractional Flow Reserve ("FFR") was another procedure that could be performed

together with cardiac catheterization. Unlike IVUS, which assessed anatomy, FFR demonstrated

the functional performance of the artery. FFR measured blood pressure and flow through a

specific part of the coronary artery and thereby assisted in determining whether or not to perform

angioplasty or stenting on intermediate blockages. FFR was available to PERSAUD but he did

not use FFR.

     17.    A cardiac stent was a device placed in a coronary artery to treat coronary artery

disease as part of a procedure called percutaneous coronary intervention ("PCI"). As a general

principle, cardiac stents were used depending on certain features of the artery blockage, such as

the size of the artery and the location of the blockage. Cardiologists and other medical

professionals sometimes referred to the blockage as a "lesion" or "stenosis." When the blockage

was severe enough, coronary bypass surgery was another procedure that could be performed. A

surgeon could perform a coronary artery bypass graft ("CABG") that restored blood flow to the

heart muscle by diverting the flow of blood around a section of a blocked artery in the heart.

     18.    Medicare and private insurers would not pay for a coronary stent that was not

"medically necessary." It was generally accepted within the cardiac community that a coronary

stent was not "medically necessary" absent a diagnosis of at least a 70 percent lesion and

6

symptoms of blockage. Medicare and private insurers likewise would not pay for a CABG that was not "medically necessary."

19.  Following placement of cardiac stents, patients were required to take certain medication regularly and they had a higher risk for additional and adverse medical conditions when undergoing certain other medical tests and procedures.

20.  Aortograms involved placing a catheter in the aorta and injection of contrast material while taking x-rays of the aorta. Renal angiograms involved placing a catheter and an injection of contrast material while taking x-rays of the arteries feeding the kidneys. Renal angiography was a tool used to define disease in renal arteries and was medically necessary only when non-invasive testing suggested disease or the patient was at increased risk for disease and non-invasive testing was not available. Aortograms and renal angiograms subjected patients to increased health risks associated with the use of contrast material, including risks of kidney failure, cancer, and the formation of clots and debris that could cause strokes or loss of circulation. Aortograms and renal angiograms were separately reimbursable by Medicare and private insurers.

**E.  Billing**

21.  The American Medical Association assigned and published five digit codes, known as the Current Procedural Terminology (CPT) and Level 1 Healthcare Common Procedure Coding System (HCPCS) codes. The codes were a systematic listing of procedures and services performed or ordered by health care providers. The purpose of the terminology was to provide uniform language that accurately described medical, surgical, and diagnostic services and supplies, thereby providing an effective means for reliable nationwide communication

7

among physicians, patients and third parties.  The procedures and services represented by CPT and HCPCS codes were health care benefits, items, and services within the meaning of Title 18, United States Code, Section 24(b).

## THE SCHEME AND ARTIFICE TO DEFRAUD

22.      From on or about February 16, 2006, through on or about June 28, 2012, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, did devise and intend to devise a scheme and artifice to defraud and to obtain money from federal health care benefit programs by means of false and fraudulent pretenses, representations and promises.

It was part of the scheme to defraud that at various times:

23.      PERSAUD submitted billings to Medicare and the private insurers for office evaluation and management of patients.  PERSAUD selected the billing code for each customer, and PERSAUD's staff then submitted that billing code to Medicare and the private insurers on PERSAUD's behalf.  PERSAUD used codes that reflected a service that was more costly than that which was actually performed.  PERSAUD received payment from the patients' insurance companies based on the submission of claims with these inflated billing codes.  PERSAUD billed most office visits with CPT Code 99215, the highest code level and reimbursement rate, without medical necessity documented for that code.

24.      PERSAUD performed Nuclear Stress Tests on patients that were not medically necessary.

25.      PERSAUD knowingly recorded false results of patients' Nuclear Stress Tests to justify cardiac catheterization procedures that were not medically necessary.

26.      PERSAUD performed cardiac catheterizations on patients at the hospitals and

8

falsely recorded the existence and extent of lesions observed during the procedures in medical records required to be kept by health care benefit programs.

27.     PERSAUD recorded false symptoms in patient records to justify testing and procedures on patients.

28.     PERSAUD inserted cardiac stents in patients who did not have 70 percent or more blockage in the vessel that he stented and who did not have symptoms of blockage.

29.     PERSAUD used IVUS to evaluate the level of stenosis in an artery when it was medically unnecessary to use IVUS.

30.     When using IVUS, PERSAUD knowingly and improperly recorded the area percent stenosis in order to obtain a high enough number – which was then falsely represented as a diameter stenosis measurement – to justify insertion of a stent. Persaud initiated an area percent stenosis calculation by measuring the angiographically appearing abnormal segment but did not obtain a proper reference point to complete the calculation by obtaining measurement(s) at an angiographically appearing normal segment(s).

31.     PERSAUD placed a stent in a stenosed artery that already had a functioning bypass, thus providing no medical benefit and increasing the risk of harm to the patient.

32.     PERSAUD improperly referred patients for coronary artery bypass surgery when there was no medical necessity for such surgery, which benefitted PERSAUD by increasing the amount of follow-up testing he could perform and bill to Medicare and the private insurers.

33.     PERSAUD performed medically unnecessary cardiac stent procedures on his patients.

34.     PERSAUD performed medically unnecessary aortograms on his patients.

35.     PERSAUD performed medically unnecessary renal angiograms on his patients.

36.     PERSAUD performed medically unnecessary procedures on his patients and ordered medically unnecessary testing for his patients.

37.     PERSAUD caused false and fraudulent claims to be submitted to health care benefit programs.

38.     PERSAUD understood that patients who underwent cardiac stent procedures were more likely to become regular patients of his practice and would provide opportunities for frequent follow up visits and testing.

39.     PERSAUD ordered that his cardiac patients have unnecessary routine follow up visits and undergo unnecessary diagnostic testing such as Nuclear Stress Tests, ECHOs, and ECG or EKG procedures.

40.     PERSAUD caused claims for medically unnecessary procedures, services and testing to be submitted to health care benefit programs.

41.     As a result of the scheme, PERSAUD overbilled and caused the overbilling of Medicare and private insurers in the amount of approximately $7.2 million, upon which claims Medicare and the private insurers paid approximately $1.5 million.

## COUNT 1
### (Health Care Fraud – 18 U.S.C. § 1347)

42.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41 of the Indictment as if fully set forth herein.

43.     From on or about February 16, 2006, through on or about June 28, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant HAROLD PERSAUD,

aka HARRY PERSAUD, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare and the private insurers, and to obtain by means of false and fraudulent pretenses and representations described herein, money and property owned by, and under the custody and control of Medicare and private insurers, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Sections 1347 and 2.

The Grand Jury further charges:

## COUNT 2
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

44.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41 of the Indictment as if fully set forth herein.

45.     When a medical provider performed a cardiac catheterization and inserted a stent, the provider was required to accurately document and maintain a medical record of his findings for treating the patient, any intervention and subsequent reimbursement. In the cardiac catheterization labs at the hospitals, PERSAUD documented his findings in medical records such as the "Cardiology Catheterization Report," "Cardiology Procedure," "Cardiac Catheterization" and "Cardiac Catheterization Report" (collectively the "Catheterization Report").

46.     Medicare and private insurers had the authority to conduct reviews of claims for medical necessity and to require the provider of services to produce medical records to support any claim made. A review of medical records enabled Medicare and private insurers to confirm that the services furnished were reflected on the claim as well as the medical necessity of the

11

service provided.

47.      On or about March 23, 2011, in the Northern District of Ohio, Eastern Division,

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care

benefit program, did knowingly and willfully make, and cause to be made, a materially false,

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

materially false writing and document knowing the same contained a materially false, fictitious,

and fraudulent statement and entry, in connection with the delivery of and payment for health

care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization

Report of Patient CB to state that the lesion in Patient CB's RCA was 60 percent, then well

knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

statement and entry, in that the lesion was substantially less than 60 percent and, in fact, was less

than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 3
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

48.      The Grand Jury realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

49.      On or about July 7, 2011, in the Northern District of Ohio, Eastern Division,

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care

benefit program, did knowingly and willfully make, and cause to be made, a materially false,

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient MG to state that the lesion in Patient MG's LAD was 80-90 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 80-90 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 4
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

50.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

51.     On or about August 25, 2010, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient MG to state that the lesion in Patient MG's RCA was 75 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

statement and entry, in that the lesion was substantially less than 75 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 5
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

52.    The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

53.    On or about June 2, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient GG to state that the lesion in Patient GG's LAD was 72 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 72 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

14

## COUNT 6
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

54.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

55.     On or about May 18, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient SH to state that the lesion in Patient SH's RCA was 70 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 7
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

56.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

57.     On or about March 24, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false,

15

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient AK to state that the lesion in Patient AK's LAD was 71 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 71 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 8
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

58.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

59.     On or about February 28, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient JR to state that the lesion in Patient JR's RCA was 71 percent, then well

16

knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 71 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 9
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

60.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

61.     On or about February 26, 2010, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient JR to state that the lesion in Patient JR's LAD was 70 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

17

## COUNT 10
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

62.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

63.     On or about February 26, 2010, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient JR to state that the lesion in Patient JR's Circumflex was 60-70 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 60-70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 11
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

64.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

65.     On or about August 31, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false,

18

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient DS to state that the lesion in Patient DS's RCA was 60-70 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 60-70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

**COUNT 12**
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

66.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

67.     On or about August 31, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient DS to state that the lesion in Patient DS's Left Main was 60 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

19

statement and entry, in that the lesion was substantially less than 60 percent and, in fact, was substantially less than 50 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 13
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

68.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

69.     On or about December 29, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient JS to state that the lesion in Patient JS's LAD was 60-65 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 60-65 percent and, in fact, less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

20

**COUNT 14**
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

70.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

71.     On or about May 25, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry on the billing sheet for Patient GG to state that GG was suffering from chest pain and angina, then well knowing that the billing sheet contained a materially fictitious, and fraudulent statement and entry, in that GG did not then suffer from chest pain and angina.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

**COUNT 15**
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

72.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

73.     On or about December 14, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a

21

materially false, fictitious, and fraudulent statement and representation, and made, caused to be

made, and used a materially false writing and document knowing the same contained a materially

false, fictitious, and fraudulent statement and entry, in connection with the delivery of and

payment for health care benefits, items and services; that is, PERSAUD caused an entry on the

medical record for Patient JS to state that JS was suffering from chest pain and dyspnea, then

well knowing that the medical record contained a materially fictitious, and fraudulent statement

and entry, in that JS did not then suffer from chest pain and dyspnea.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

**COUNT 16**
(Engaging in Monetary Transactions in Property Derived from
Criminal Activity – 18 U.S.C. 1957)

74.    The Grand Jury realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

75.    On or about August 31, 2012, in the Northern District of Ohio, Eastern Division,

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, did knowingly engage and attempt

to engage in a monetary transaction by, through, and to a financial institution, affecting interstate

and foreign commerce, in criminally derived property of a value greater than $10,000, that is

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, made a transfer of $250,000, via

check number 3776, from PERSAUD's business bank account at Key Bank, identified by

account number XXXXXXX246, to a certificate of deposit (CD) at Ohio Savings Bank in the

name of PERSAUD's wife, identified by account number XXXXXXXXX442, such property

having been derived from a specified unlawful activity, that is, health care fraud, as alleged in

22

Count 1 of this Indictment.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## FORFEITURE

76.    For the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982, the allegation of Counts 1 through16 are incorporated herein by reference.  As a result of the foregoing offenses, defendant HAROLD PERSAUD, aka HARRY PERSAUD, shall forfeit to the United States any property involved in charges set forth herein, or any property traceable to such property and/or any property that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the charges set forth herein; including, but not limited to, the following:

a.    Money Judgment in the amount equal to the proceeds Defendant HAROLD PERSAUD, aka HARRY PERSAUD, obtained as a result of such violations;

b.    $93,446.25 in U.S. Currency, seized from Key Bank Account #XXXXXX6246 in the name of Harold Persaud; and,

c.    $250,188.42 in U.S. Currency, seized from Ohio Savings Bank Account #XXXXXXXX8442 in the name of Roberta Persaud.


A TRUE BILL.



Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.